USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3-13-15

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | | |
|---|---|---|
| **STACY DONNELLY,** | : | |
| | : | |
| Plaintiff, | : | **REPORT AND** |
| | : | **RECOMMENDATION** |
| -against- | : | |
| | : | **13-CV-07244 (AJN) (RLE)** |
| | : | |
| **CAROLYN W. COLVIN, as Acting Commissioner of** | : | |
| **the United States Social Security Administration,** | : | |
| | : | |
| Defendant. | : | |

---

**To the HONORABLE ALISON J. NATHAN, United States District Judge:**

## I.   INTRODUCTION

Plaintiff Stacy Donnelly ("Donnelly") commenced this action under the Social Security Act ("Act"), 42 U.S.C. 405(g), challenging the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for disability benefits.  On June 20, 2014, Donnelly filed a motion for judgment on the pleadings (Pl's Mem. Law Supp. Pl's Mot. Judgment Pleadings ("Pl. Mot.") at 7) seeking the reversal of the Commissioner's final decision and remand solely for the calculation of benefits, or alternatively, to remand the case for reconsideration of the evidence. (Pl. Mot. at 7.)  Donnelly argues that the record supports the conclusion that she is disabled and does not have the residual functional capacity to work.  (Pl. Mot. at 7-8.)  The Commissioner filed a cross-motion for judgment on the pleadings on October 1, 2014, (Def's Mem. Law Supp. Comm'r's Cross-Mot. Judgment Pleading ("Def. Mot.") at 2), and on October 17, 2014, Donnelly filed a reply.  (Reply Mem. Law Further Supp. Pl's Mot. Judgment Pleadings and Opp'n Def. Cross-Mot. Pleadings ("Pl. Reply") at 2.)  For the reasons that follow, I recommend that

Donnelly's motion be **GRANTED IN PART,** and that the case be **REMANDED** for further administrative proceedings.

## II.     BACKGROUND

### A. Procedural History

Donnelly applied for disability insurance and Supplemental Security Income benefits, on August 26, 2009. (Pl. Mot. at 7.)  Her applications were denied on November 3, 2009 (*Id.* at 7.) On November 6, 2009, Donnelly filed a request for a hearing that was ultimately held before Administrative Law Judge ("ALJ") Gitel Reich on September 2, 2010.  (Tr. of Administrative Proceeding ("Tr.") at 142.)  The ALJ denied Donnelly's application for Social Security Disability benefits on November 12, 2010, finding that Donnelly was not disabled under the Act. (Tr. at 103.)  Donnelly requested review by the Appeals Council on November 22, 2010.  (*Id.* at 165.)  On May 25, 2012, the Appeals Council granted review and remanded the case.  (*Id.* at 119.)  Specifically, the Appeals Council asked the ALJ to evaluate Donnelly's mental impairments, give further consideration to her residual functional capacity and, if warranted, consult a vocational expert to provide examples of jobs she can perform.  (Tr. at 9.)

On September 13, 2012, Donnelly reappeared before ALJ Reich.  (*Id.* at 9.)  ALJ Reich denied Donnelly's applications for Social Security Disability benefits on October 25, 2012, finding that Donnelly was not disabled under the Act.  (*Id.* at 6.)  Donnelly sought review by the Appeals Council, but her request was denied.  (Id. at 1.)  The ALJ's decision became the Commissioner's final decision.  Donnelly filed this action on November 8, 2012.  (*Id.* at 4.)

## B.  ALJ Hearing I

### 1. Donnelly's Testimony

Donnelly was born on June 20, 1981. (Pl. Mot. at 8.) She is the mother of an autistic boy. (*Id.*) After graduating from high school, Donnelly worked as a retail sales assistant for six years and as a makeup artist for four years. (Tr. at 238.)  In 2008, she was diagnosed with papillary thyroid cancer. (Tr. at 13.)  She had the right lobe of her thyroid removed on July 16, 2008. (*Id.* at 14.) The cancer, however, had spread to her left lobe, and it was removed on August 19, 2008. (*Id.*)  After her thyroidectomy, Donnelly received radiation therapy. (Pl. Mot. at 8.)  She had a full body radioactive scan in November 2008 and again in November 2009. (Tr. at 14.)  Both scans showed no further metastases[1]. (*Id.*)  Nonetheless, after the surgeries and treatments, Donnelly complained of fatigue, palpitations upon exertion, lightheadedness, weight lost, and swelling of the hands and feet. (Tr. at 111.)  Her illness began to significantly interfere with her ability to work such that she had to stop completely by July 16, 2008. (Tr. at 237; Pl. Mot. at 8.) Donnelly receives annual radiation therapy and takes daily medications which causes bleeding of the mouth and dry skin. (Pl. Mot. at 8.)

Aside from thyroid cancer, Donnelly also suffers from major depression and moderate, recurrent post-traumatic stress disorder for which she attends weekly psychotherapy and monthly psychiatric sessions. (Pl. Mot. at 9.)  She takes Seroquel for depression but it causes fatigue. (*Id.*)  Additionally, Donnelly suffers from frequent migraines for which she takes Inderal daily. (Tr. at 37.)  Inderal shortens the duration of her headaches but causes fatigue. (Pl. Mot. at 9.)

---

[1] Metastasis is the spread of cancer cells to other parts of the body.  AMERICAN HERITAGE DICTIONARY 1104 (4th ed. 2000).

Donnelly is the sole caretaker of her autistic son, who was three and a half years old at the time of the hearing. Her only means of income was welfare and her son's SSI. (Tr. at 3; Pl. Mot. at 8.)

### 2. Vocational Expert's Testimony

No vocational expert testified at this hearing. ALJ Reich stated that she relied on the Medical-Vocational Guidelines in her evaluation of the medical record. (Tr. at 114.) Along with the Medical-Vocational Guideline, the ALJ also considered Donnelly's residual functional capacity, age, education, and work experience. (*Id.* at 113.) The ALJ concluded that Donnelly's "additional limitations have little or no effect on the occupational base of unskilled sedentary work."(*Id.* at 114.) Most importantly, ALJ Reich found Donnelly's "residual functional capacity for sedentary work [was] not significantly compromised by her mental limitations…or hazardous environment restriction." (*Id.*)

### 3. Medical Evidence

#### a. St. Luke's- Roosevelt Hospital

Donnelly began outpatient weekly psychotherapy at St Luke's-Roosevelt Hospital Women's Health Program in May 2009. (Tr. at 36.) She was diagnosed with posttraumatic stress disorder and major depressive disorder. (Tr. at 428.)

(1) Elizabeth Katcher, M.A

Donnelly's primary therapist, Elizabeth Katcher, a psychology extern, completed a Medical Impairment Form on November 1, 2010. (Tr. at 514-15.) Katcher found that Donnelly had "unlimited" and "very good ability" to follow work rules and could "function independently." (*Id.* at 516.) She noted, however, that Donnelly "demonstrated a limited

capacity to deal with stress in her life since being diagnosed with thyroid cancer" and that her illness "had significantly affected her ability to concentrate and pay attention." (*Id.*)

Katcher determined that Donnelly's ability to deal with work stress and maintain attention and concentration was markedly impaired. (Tr. at 516.) She maintained that Donnelly was markedly impaired in her ability to behave in an emotionally stable manner and relate predictably in social situations, observing that she "is often tearful and depressed, and has some difficulty regulating her affect. Her emotions appear to be somewhat volatile, ranging from depressed and tearful to irritable and frustrated to anxious and worried." (Tr. at 517.)

Donnelly complained to Katcher she had little energy and had difficulty completing her daily and necessary tasks. (Tr. at 518.) She also informed Katcher that she had problems sleeping and remaining alert throughout the day. (*Id.*)

(2) Dr. Collette Haward

Dr. Collette Haward completed a Medical Impairment Form for Donnelly on August 31, 2012. (Tr. 610-13.) Although Dr. Haward noted that Donnelly was able to manage her affairs in her own best interest, follow work rules, relate to co-workers, use judgment, interact with supervisor, and function independently, she found that Donnelly's ability to deal with work stresses was markedly impaired. (Tr. at 611-13.) She also found that Donnelly's ability to "demonstrate reliability" was "markedly impaired." (*Id.*)

(3) Carole Srinivasan, Ph.D.

In a September 19, 2011 therapy session with Carole Srinivasan, Ph.D., Donnelly scored a fifty-four on the Beck Depression Inventory,[2] which is in the range of severe depression. (Tr.

---

[2] Beck Depression Inventory (BDI) is a multiple choice self-report inventory assessment, widely used by mental health professionals to measure the severity of depression. The score is assessed as follows: A 0-9 score signifies minimal depression; 10-18 mild depression, 19-29 moderate depression and 30-63 severe depression. http://www.apa.org/pi/about/publications/caregivers/practice-settings/assessment/tools/beck-depression.aspx

at 600.) Prior to this visit, Donnelly experienced significant heart palpitations which prompted her doctors to lower the dosage of her depression medication. (*Id.*) Donnelly reported that her depression worsened following the change in her medication. (*Id.*) She felt more anxious, slept less (two hours each night) and had no appetite. (*Id.*) She had suicidal thoughts and actions and on one occasion even went as far as taking out the pills she would use, but pictures and thoughts of her son stopped her from going through with the suicide. (*Id.*)

In her exploration of Donnelly's medical and mental health history, Dr. Srinivasan found that Donnelly had a history of neglect and psychological disorders. (Tr. at 600.) Donnelly's mother was diagnosed with schizophrenia and her fraternal twin sister was diagnosed with autism and was living in an adult assisted living facility. (Tr. at 599-600.)

On September 6, 2012, Dr. Srinivasan completed a Medical Impairment Form. (Tr. at 614-17.) She found Donnelly's ability to deal with work stresses and demonstrate reliability markedly impaired, but determined that Donnelly could manage benefits in her own best interest. (*Id.*)

### b. New York Presbyterian Hospital

Donnelly has a history of throat issues. She had frequent sore throats and throat infections. (Tr. at 329.) She also had trouble breathing and her voice changed because of the size of her tonsils. (*Id.*) When these problems did not go away, she had an ultrasound of her right thyroid on March 26, 2008. (Tr. at 326.) A follow-up ultrasound on May 7, 2008, found that the right thyroid node had increased in size since the prior scan. (Tr. at 358.) On July 16, 2008, a right thyroid biopsy revealed that Donnelly had Papillary Carcinoma, Nuclear Grade II. (Tr. at 323.) After the removal of her right node, subsequent scans showed that the cancer had spread to the left thyroid, (Tr. at 321.), and it was removed on August 19, 2008. (*Id.*)

The thyroidectomy was followed by oral radioactive iodine therapy, which commenced on November 13, 2008. (Tr. at 339.) Ninety-six hours after the iodine therapy, Donnelly had a full body scan which found no evidence of the cancer. (Tr. at 338.) A follow-up ultrasound on May 4, 2009, was also negative. (Tr. at 336-37.) Donnelly had another whole body scan on November 2009, which was also negative. (Tr. at 14.)

On August 19, 2009, Donnelly's endocrinologist, Dr. Mona Parikh, an internist at New York Presbyterian ("NYP"), completed a "Treating Physician Wellness Plan Report." She indicated that Donnelly's hormones were "still not correct" and were "symptomatic." (Tr. at 365.) Based upon her evaluation of Donnelly's medical file and her own examination, Dr. Parikh determined Donnelly was "unable to work for at least twelve months." (Tr. at 365.) She opined that Donnelly was unemployable "because she needs to have regular body scans and her medicines titrated[3]." (Tr. at 14.)

### c. Consultative Evaluation

(1) Michael Alexander, Ph.D.

Dr. Michael Alexander examined Donnelly in September 2009. (Tr. at 15). He found no evidence of panic or manic-related symptoms. (Tr. at 367.) He determined that her remote memory skills, cognitive functions, insight and judgment were all "good". (Id. at 368.) He noted that Donnelly lived and took care of her son alone. She could follow and understand simple directions and could perform simple tasks independently. (Id.) Although Donnelly exhibited psychiatric problems, Dr. Alexander concluded that they were not significant enough to impede her ability to function on a daily basis. (Id.) He diagnosed Donnelly with depression

---

[3] Titrate is the process by which doctor's determine the concentration of the medicine. AMERICAN HERITAGE DICTIONARY 1814 (4th ed. 2000).

and recommended she continue to get psychiatric treatment. (*Id*. at 368-69.) Dr. Alexander determined that Donnelly's prognosis was "good". (Tr. at 369.)

(2) Dr. Brian Hamway

Brian Hamway, M.D., an internist, completed a medical consultative examination of Donnelly on September 29, 2009. (Tr. at 14.) He determined that Donnelly's heart palpitations were caused by excessive dosage of Synthroid, a medication she takes to replace her missing thyroid hormones. (*Id*.) Dr. Hamway determined Donnelly's prognosis to be "good" and concluded that she had "no limitations based on the medical evaluation done today." (*Id*. at 373.)

(3) Dr. M. Husain

On October 19, 2009, state agency consulting physician, Dr. M. Husain, completed a Physical Residual Functional Capacity ("PRFC") Assessment of Donnelly finding frequent impairment in climbing, balancing, stooping, kneeling, crouching and crawling. (Tr. at 376.) He found no communicative or environmental limitations. (*Id*.) However, after considering Donnelly's "history of dizziness, low weight (BMI of 17.8) and [blood pressure] on the lower side of normal with background of [thyroid cancer]" and consulting Dr. Hamway's evaluation, Dr. Husain concluded light physical residual functional capacity. (Tr. at 378.)

On November 3, 2009, Dr. Husain repeated his previous conclusion that Donnelly had light physical residual function capacity and added that she had heights and machinery limitations. (Tr. at 411.)

(4) T. Harding, Ph.D.

On October 20, 2009, T. Harding, Ph.D. completed a Mental Residual Functional Capacity ("MRFC") Assessment evaluating Donnelly for major depression. (Tr. at 396, 398.)

8

Relying on Dr. Hamway's medical examination and the medical notes from St. Luke's, Dr.

Harding concluded that Donnelly "retains the mental capacity to do a job with simple tasks."

(Tr. at 398.)  Dr. Harding noted that Donnelly's "symptoms were relieved by psychotropic

medication."  (*Id.* at 15.)

> (5) Dr. Irun Bhan

Donnelly's primary care physician, Dr. Irun Bhan, completed an assessment of Donnelly

on September 12, 2012. (Tr. at 628.)  Dr. Bhan diagnosed Donnelly with migraines and noted

that her MRI was consistent with the diagnosis. (*Id.* at 625.)  Although Donnelly had daily,

frequent headaches for which a cure was unlikely, Dr. Bhan believed she could find better

control with a change in her medications.  (*Id.* at 626.)  Dr. Bhan determined that Donnelly's

impairments could be expected to last at least twelve months.  (*Id.*)  While experiencing a

migraine, Donnelly would not be able to perform basic work activities and would need frequent

breaks. (Tr. at 627.)  Dr. Bhan found Donnelly would not be able to work a typical workday as

she would need at least two unscheduled breaks throughout the day.  (*Id.*)  Dr. Bhan opined that

because of her migraines, Donnelly would need to lie down for at least two hours each break

period. (Tr. at 14.)  Nonetheless, Dr. Bhan concluded that Donnelly was capable of low stress

work.  (*Id.*)

### 4. ALJ Gitel Reich's Findings

Following a hearing on September 2, 2010, ALJ Reich issued a decision on November

12, 2010, finding that Donnelly was not disabled under the Act, and was not entitled to disability

benefits. (Tr. at 103.)  To support her decision, ALJ Reich noted that the record showed

Donnelly was only mildly restricted in her daily living activities, had moderate difficulties in her

social functioning, and had moderate difficulties with concentration, persistence or pace. (Tr. at

109.)  Furthermore, since the body scans showed her cancer had not spread since her radioactive

treatment, Donnelly's cancer did not meet the requirements of impairments found in 20 C.F.R.

Part 404, Subpart P, Appendix 1.  (Tr. at 108.)

ALJ Reich also considered Donnelly's mental impairments.  Here, too, she found they

did not meet the medical criteria listed in the Act.  (*Id.*)  After reviewing Donnelly's physicians'

notes and those from the consultative examinations, ALJ Reich found that Donnelly had "the

residual functional capacity to perform sedentary work...except that her non-exertional

limitations reduce her residual functional capacity to simple work."  (Tr. at 109.)  Those

limitations were further curtailed by Donnelly's history of dizziness which prevented her from

working at heights or around machinery.  (*Id.*)

ALJ Reich noted that Donnelly's past work as a makeup artist and retail sales assistant

required her to stand beyond the sedentary level and concentrate beyond the level of simple

work.  (*Id.* at 110.)  Thus, she concluded that Donnelly could not perform her past work, but that

there were a significant number of jobs in the national economy she could perform.  (Tr. at 113.)

### 5. Appeals Council Review

On May 25, 2012, the Appeals Council granted Donnelly's request for review.  (Tr. at

119.)  The Council remanded the case, finding that the ALJ had failed to provide an evaluation

of Donnelly's mental impairment and to indicate the weight given to each physician under the

treating physician rule.  (Tr. at 9.)  In particular, the Appeals Council noted that the ALJ did not

specify the weight given to Dr. Mona Parikh's opinion.  (*Id.* at 120.)

The Appeals Council ordered the ALJ to evaluate Donnelly's "mental impairment

providing specific findings and appropriate rationale for each functional area and to evaluate the

treating source opinions and explain the weight given to each opinion."  (Tr. at 9.)  It also

10

instructed the ALJ, if appropriate, to "obtain evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base." (Tr. at 121.) The expert would be required to "identify examples of appropriate jobs and to state the incidence of such jobs in the national economy." (*Id.*)

## C. ALJ Hearing II

### 1. Donnelly's Testimony

Donnelly reappeared before ALJ Reich on September 13, 2012. (Tr. at 70.) Donnelly was still taking Synthroid, a synthetic hormone, for her thyroid cancer. (*Id.* at 76.) She was still experiencing fatigue as a side effect of the medication and the thyroidectomy. (Tr. at 77.) Donnelly also complained that the medication made her dizzy. (Tr. at 78.) Every three months Donnelly had to visit the hospital to check her thyroid level and the dosage of her medication. (*Id.* at 77) Donnelly had heart palpitations which worsened when she walked up and down stairs. (*Id.* at 81).

By the second hearing, Donnelly's younger sister had moved in with her, and helped care for Donnelly's son and with household chores. (Tr. at 84-85). Donnelly had very few social interactions, she had few friends, and rarely went out. (Tr. at 86.) She spent her day alone at home, lying on the couch and occasionally watching television. (*Id.* at 87-88.)

### 2. Vocational Expert's Testimony

In lieu of testimony from a vocational expert, ALJ Reich said she relied on the Medical-Vocational Guideline as a framework to determine whether Donnelly was eligible for benefits. (Tr. at 20.) After consulting the medical record, including the notes from Donnelly's physicians, ALJ Reich determined that Donnelly could perform unskilled work requiring limited contact with people and that "her non-exertional limitations [did] not significantly limit the range of

unskilled light work she [could] perform." (*Id.*)  She concluded that Donnelly's non-exertional limitations did not "have more than a slight effect on her occupational base." (*Id.*)

### 3. ALJ's Findings on Remand

On October 25, 2012, ALJ Reich again denied Donnelly's claims.  (Tr. at 6.)  She found Donnelly had not worked since July 16, 2008, the date of her alleged onset of disability.  (Tr. at 11).  ALJ Reich determined that Donnelly had severe impairments from her thyroidectomy "with continuing hormonal treatment, migraine headaches, and depressive disorder." (*Id.*)  The ALJ concluded that these impairments were not severe enough to prevent Donnelly from gainful employment and were not on the list of impairments "that meets or medically equal severity of one listed" in 20 C.F.R. Part 404, Subpart P, App.1. (*Id.*)

ALJ Reich reviewed the assessments of several medical professionals.  She gave greater weight to Dr. Srinivasan's assessment of Donnelly than to Katcher's, noting that Katcher is not a psychologist or a psychiatrist. (*Id.* at 18-19.)  In addition, ALJ Reich gave some weight to the consultative examiners and the State agency medical consultants.  (Tr. at 19.)  She disagreed, however, with consultative examiner Dr. Brian Hamway who assessed Donnelly as able to work with no limitation. (*Id.*)  ALJ Reich concluded that Donnelly's residual functional capacity for sedentary, simple work and her history of fatigue prevent her from doing her past work. (*Id.*)  In determining what type of work Donnelly can perform, ALJ Reich relied on Social Security Ruling 83-10 which "presume[s] that the claimant is able to perform unskilled jobs at the pertinent exertional levels." (Tr. at 20.)  Applying this rule to Donnelly's case, ALJ Reich concluded that Donnelly "is still capable of performing unskilled work requiring only occasional contact with people, her non-exertional limitations do not significantly limit the range of

unskilled light work she can perform." (*Id.*)  ALJ Reich found Donnelly was not disabled under § 216(i) and 223(d) of the Act.  (*Id.*)

### 4. Appeals Council Review

On September 10, 2013, the Appeals Council denied Donnelly's request for review of ALJ Reich's October 25, 2012 decision.  (Tr. at 1.)  Under the rules of review, the Appeals Council found no grounds to reexamine the ALJ's decision.  (*Id.*)  Thus, the ALJ's October 25, 2012 decision became the Commissioner's final decision.  (*Id.*)

## III. DISCUSSION

### A.  Standard of Review

Upon judicial review, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §§ 405(g), 1383(c)(3.) Therefore, a reviewing court does not determine de novo whether a claimant is disabled. *Brault v. Soc. Sec. Admin. Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam) (citing *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996)); *accord Mathews v. Eldridge*, 424 U.S. 319, 339 n.21 (1976) (citing 42 U.S.C. § 405(g).)  Rather, the court is limited to "two levels of inquiry." *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987.)  First, the court must determine whether the Commissioner applied the correct legal principles in reaching a decision.  42 U.S.C. § 405(g); *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999) (citing *Johnson*, 817 F.2d at 986); *accord Brault*, 683 F.3d at 447.  Second, the court must decide whether the Commissioner's decision is supported by substantial evidence in the record.  42 U.S.C. § 405(g.)  If the Commissioner's decision meets both of these requirements, the reviewing court must affirm; if not, the court may modify or reverse the Commissioner's decision, with or without remand.  *Id.*

An ALJ's failure to apply the correct legal standard constitutes reversible error, provided that the failure "might have affected the disposition of the case." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)); *accord Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008.) This applies to an ALJ's failure to follow an applicable statutory provision, regulation, or Social Security Ruling ("SSR".) *See, e.g., Kohler*, 546 F.3d at 265 (regulation); *Schaal v. Callahan*, 933 F. Supp. 85, 93 (D. Conn. 1997) (SSR.) In such a case, the court may remand the matter to the Commissioner under sentence four of 42 U.S.C. § 405(g), especially if deemed necessary to allow the ALJ to develop a full and fair record to explain her reasoning. *Crysler v. Astrue*, 563 F. Supp. 2d 418, 428 (N.D.N.Y. 2008) (citing *Martone v. Apfel*, 70 F. Supp. 2d 145, 148 (N.D.N.Y. 1999).)

If the reviewing court is satisfied that the ALJ applied correct legal standards, then the court must "conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision." *Brault*, 683 F.3d at 447 (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009).) The Supreme Court has defined substantial evidence as requiring "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *accord Brault*, 683 F.3d at 447-48. The substantial evidence standard means once an ALJ finds facts, a reviewing court may reject those facts "only if a reasonable factfinder would have to conclude otherwise." *Brault*, 683 F.3d at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)) (emphasis omitted.)

To be supported by substantial evidence, the ALJ's decision must be based on consideration of "all evidence available in [the claimant]'s case record." 42 U.S.C. §§

14

423(d)(5)(B), 1382c(a)(3)(H)(i.)  The Act requires the ALJ to set forth "a discussion of the evidence" and the "reasons upon which it is based." 42 U.S.C. §§ 405(b)(1.)  While the ALJ's decision need not "mention[] every item of testimony presented," *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) (per curiam), or "reconcile explicitly every conflicting shred of medical testimony," *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (quoting *Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir. 1983)), the ALJ may not ignore or mischaracterize evidence of a person's alleged disability. See *Ericksson v. Comm'r of Soc. Sec.*, 557 F.3d 79, 82-84 (2d Cir. 2009) (mischaracterizing evidence); *Kohler v. Astrue*, 546 F.3d 260, 269 (2d Cir. 2008) (overlooking and mischaracterizing evidence); *Ruiz v. Barnhart*, No. 01 Civ. 1120 (DC), 2002 WL 826812, at *6 (S.D.N.Y. May 1, 2002) (ignoring evidence); *see also Zabala*, 595 F.3d at 409 (reconsideration of improperly excluded evidence typically requires remand.)  The ALJ must discuss the "the crucial factors in any determination . . . with sufficient specificity to enable the reviewing court to decide whether the determination is supported by substantial evidence." *Calzada v. Astrue*, 753 F. Supp. 2d 250, 269 (S.D.N.Y. 2010) (quoting *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).)

## B. Determination of Disability

### 1. Evaluation of Disability Claims

Under the Social Security Act, every individual considered to have a "disability" is entitled to disability insurance benefits. 42 U.S.C. § 423(a)(1.)  The Act defines "disability" as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* at §§ 416(i)(1)(A), 423(d)(1)(A), 1382c(a)(3)(A); *see also* 20 C.F.R. §§ 404.1505, 416.905. A

claimant's impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); *see also* 20 C.F.R. §§ 404.1505, 416.905.

To determine whether an individual is entitled to receive disability benefits, the Commissioner is required to conduct the following five-step inquiry: (1) determine whether the claimant is currently engaged in any substantial gainful activity; (2) if not, determine whether the claimant has a "severe impairment" that significantly limits his or her ability to do basic work activities; (3) if so, determine whether the impairment is one of those listed in Appendix 1 of the regulations – if it is, the Commissioner will presume the claimant to be disabled; (4) if not, determine whether the claimant possesses the RFC to perform his past work despite the disability; and (5) if not, determine whether the claimant is capable of performing other work. 20 C.F.R. § 404.1520; *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999); *Gonzalez v. Apfel*, 61 F. Supp. 2d 24, 29 (S.D.N.Y. 1999.) While the claimant bears the burden of proving disability at the first four steps, the burden shifts to the Commissioner at step five to prove that the claimant is not disabled. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 123 (2d Cir. 2012.)

The ALJ may find a claimant to be disabled at either step three or step five of the Evaluation. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4.) At step three, the ALJ will find that a disability exists if the claimant proves that his or her severe impairment meets or medically equals one of the impairments listed in the regulations. 20 C.F.R. §§ 404.1520(d), 416.920(d.) If the claimant fails to prove this, however, the ALJ will complete the remaining steps of the Evaluation. 20 C.F.R. §§ 404.1520(e), 404.1545(a)(5), 416.920(e), 416.945(a)(5.)

A claimant's RFC is "the most [she] can still do despite [her] limitations." 20 C.F.R. §§ 404.1545(a), 416.945(a); *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010); *see also* S.S.R. 96-9P (clarifying that a claimant's RFC is her maximum ability to perform full-time work on a regular and continuing basis.) The ALJ's assessment of a claimant's RFC must be based on "all relevant medical and other evidence," including objective medical evidence, such as x-rays and MRIs; the opinions of treating and consultative physicians; and statements by the claimant and others concerning the claimant's impairments, symptoms, physical limitations, and difficulty performing daily activities. *Genier*, 606 F.3d at 49 (citing 20 C.F.R. § 404.1545(a)(3)); *see also* 20 C.F.R. §§ 404.1512(b), 404.1528, 404.1529(a), 404.1545(b.)

In evaluating the claimant's alleged symptoms and functional limitations for the purposes of steps two, three, and four, the ALJ must follow a two-part process, first determining whether the claimant has a "medically determinable impairment that could reasonably be expected to produce [her alleged] symptoms." 20 C.F.R. §§ 404.1529(b), 416.929(b); *Genier*, 606 F.3d at 49. If so, then the ALJ "evaluate[s] the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work." 20 C.F.R. § 404.1529(c); *see also* 20 C.F.R. § 416.929(c); *Genier*, 606 F.3d at 49. The ALJ has "discretion in weighing the credibility of the claimant's testimony in light of the other evidence of record." *Genier*, 606 F.3d at 49 (citing *Marcus v. California*, 615 F.2d 23, 27 (2d Cir. 1979)); *see also* 20 C.F.R. §§ 404.1529(a), 416.929(a) (requiring that a claimant's allegations be "consistent" with medical and other evidence); *Briscoe v. Astrue*, No. 11 Civ. 3509 (GWG), 2012 WL 4356732, at *16-19 (S.D.N.Y. Sept. 25, 2012) (reviewing an ALJ's credibility determination.) In determining whether there is any other work the claimant can perform, the Commissioner has the burden of showing that "there is other gainful work in the national

economy which the claimant could perform." *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998) (citation omitted.)

### 2. Treating Physician Rule

The opinion of a claimant's treating physician is generally given more weight than the opinion of a consultative physician because the treating physician is likely "most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s.)" 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (discussing the "treating physician rule of deference".) A treating physician's opinion is entitled to "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2.) An ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must attempt to fill any clear gaps in the administrative record, *Burgess*, 537 F.3d at 139, especially where the claimant's hearing testimony suggests that the ALJ is missing records from a treating physician.

Second, the ALJ must give advance notice to a *pro se* claimant of adverse findings. *Snyder v. Barnhart*, 323 F. Supp. 2d 542, 545 (S.D.N.Y. 2004) (citing *Infante v. Apfel*, No. 97 Civ. 7689 (LMM), 2001 WL 536930, at *6 (S.D.N.Y. May 21, 2001).) This allows the *pro se* claimant to "produce additional medical evidence or call [her] treating physician as a witness." *Brown v. Barnhard*, No. 02 Civ. 4523 (SHS), 2003 WL 1888727, at *7 (S.D.N.Y. April 15, 2003) (citing *Santiago v. Schweiker*, 548 F. Supp. 481, 486 (S.D.N.Y. 1981).)

Third, the ALJ must explicitly consider various "factors" to determine how much weight to give to the opinion of a treating physician. *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citing 20 C.F.R. § 404.1527(c)(2).) These factors include: (1) the length, nature, and

extent of the treatment relationship; (2) the evidence in support of the treating physician's opinion; (3) the consistency of the opinion with the entirety of the record; (4) whether the treating physician is a specialist; and (5) other factors brought to the attention of the ALJ that support or contradict the opinion.  20 C.F.R. §§ 404.1527(c)(2) (i-ii) & (c)(3-6.)

Fourth, the ALJ is required to explain the weight ultimately given to the opinion of a treating physician. *See* 20 C.F.R. § 404.1527(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.".) Failure to provide "good reasons" for not crediting the opinion of a claimant's treating physician is a ground for remand. *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir.1998); *see also Halloran*, 362 F.3d at 32 ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and we will continue remanding when we encounter opinions from ALJs that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion.".)  Reasons that are conclusory fail the "good reasons" requirement.  *Gunter v. Comm'r of Soc. Sec.*, 361 Fed. Appx. 197, 199 (2d Cir. 2012) (finding reversible error where an ALJ failed to explain his determination not to credit the treating physician's opinion.)  The ALJ is not permitted to arbitrarily substitute his own judgment of the medical proof for the treating physician's opinion. *Balsamo*, 142 F.3d at 81.

## C. Issues on Appeal

### 1. ALJ Reich Properly Applied the Treating Physician Rule

Donnelly argues that the ALJ failed to properly evaluate the medical record in giving inadequate weight to her treating physicians, Dr. Irun Bhan and Dr. Parikh.  (Pl. Mot. at 23-25.) The ALJ stated:

> Dr. Bhan's opinion can only be accorded some, but not great weight.  This
> physician is not a specialist in any of the claimant's medical conditions and does

19

not have an extensive treating relationship with her having seen her only three times in one and one-half years. The balance of the record does not support the severity of the migraines as described in his report. The evidence shows that medications are decreasing the frequency of the claimant's headaches and provide some relief. Finally, Dr. Bhan indicates that stress is an aggravating factor for the claimant's migraines and her stress level is likely decreasing due to better coping skills as noted by Dr. Srinivasan. The additional help the claimant is now receiving at home should also decrease stress and therefore lead to a decrease in the frequency and/or severity of the claimant's migraines. (Tr. at 18.)

The ALJ properly weighed Dr. Bahn's assessment. Dr. Bahn had only treated Donnelly three times over a period of one and a half years. (Tr. at 18.) Donnelly points to the Commissioner's regulation which states the Commission "may consider an acceptable medical source who has treated or evaluated you only a few times or only after long intervals to be your treating sources if the nature and frequency of the treatment or evaluation is typical for your condition(s)" to argue for his inclusion. (Pl. Mot. at 24 quoting 20 C.F.R. §404.1502.) However, as the Commissioner notes, this rule gives the ALJ the discretion to consider a treating source. It does not require that the ALJ find the source to be a treating source, and does not dictate how such source should be weighed. (Def. Mot. at 20.) The ALJ may properly consider the frequency and length of treatment in assessing what weight to give the treating source. (Def. Mot. at 20 citing 20 C.F.R. §§ 404.1527(c)(2)(i), 416.927(c)(2)(i).) Given the limited number of visits with Dr. Bhan, the ALJ had support in the record for the weight given and articulated reasons for her decision.

In her rebuttal of the Commissioner's claim, Donnelly asserts that Dr. Bhan is a board certified internist and points to Taber's Cyclopedic Dictionary which defined internal medicine as "the medical specialty concerned with the overall health and well-being of adults." TABER'S CYCLOPEDIC MEDICAL DICTIONARY 1259 (19th ed. 2001). Donnelly argues that Bhan is thus qualified to treat and assess her migraines. (Pl. Mot. at 23.) Donnelly disputes the frequency and

20

range of treatment she received from Dr. Bhan. (Pl. Mot. at 24.) She maintains that as an

attending physician at the NY Presbyterian AIM clinic, where Donnelly received most of her

medical care, Dr. Bhan's chart on Donnelly is NY Presbyterian's chart, and thus contains the

bulk of her medical records. (*Id.*) Donnelly wants the court to infer that, while there were but

three specific contacts with Dr. Bhan, he had access to her entire file and was in a supervisory

role at the medical center and thus Donnelly's contacts with him should not be evaluated as three

limited visits, but as part of the larger care she received from New York Presbyterian. (*Id.*)

These inferences are not part of the record and Donnelly points to no part of the record to support

these assertions. The ALJ may properly rely on the evidence in the record to support her

conclusions. Donnelly provides no precedent for this assertion and has no legal basis why it

should be accepted.

Donnelly's three visits with Dr. Bhan do not constitute sufficient contact to warrant Dr.

Bhan's opinion being afforded additional weight as Donnelly's treating physician. In *Garcia v.

Barnhart*, the court found that infrequent visitation to a treating source was a deciding factor in

providing the source little weight. *Garcia v. Barnhart*, No. 01 Civ. 8300 (GEL), 2003 U.S. Dist.

Lexis 159, at *26 (S.D.N.Y. (Jan. 7, 2003) (found the ALJ must consider all the factors required

by the regulation in assigning weight to a treating source, including length and nature of visits.)

Courts in other jurisdictions have reached similar conclusions. The Sixth Circuit found that "a

single visit does not constitute an ongoing treatment relationship . . . depending on the

circumstances and the nature of the alleged condition, two or three visits often will not suffice

for an ongoing treatment relationship." *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496,

506-07 (6th Cir. 2006) and *Coulson v Comm'r of Soc. Sec*, 2011 U.S. Dist. LEXIS 104389, 19

(W.D. Mich. 2011) (finding a single examination was insufficient to warrant treating physician

status and the treating source's opinion should not receive great weight.)  Although this decision

is not binding on the Court, the Court finds the language persuasive

Donnelly also argues that the ALJ should not have given limited weight to the assessment

of her treating endocrinologist, Dr. Parikh.  (Pl. Mot. at 25.)  The ALJ limited Dr. Parikh's

opinion based on her finding that "periodic adjustment of medication and the need for regular

diagnostic tests do not establish inability to function in the workplace on a sustained and

competitive basis."  (*Id.*)  Dr. Parikh stated that Donnelly was unable to work for at least twelve

months and cited the need for a whole body scan in November and the need for continual

adjustments of her medications as support.  (Tr. at 365.)  Dr. Parikh found Donnelly still

symptomatic but only cited those factors as support and listed no vocational limitations.  (Tr. at

365, Def. Mot. at 20.)  The Commissioner correctly notes that the weight of the medical record

does not support Dr. Parikh's findings.  (Tr. at 18.)  In her testimony, Donnelly said she only

goes to the hospital once every three months to adjust her medication and her ongoing treatment

regimen consisted of follow up appointments every six months, yearly radiation treatments, and

body scans.  (Def. Mot. at 21.)  The Second Circuit has interpreted 20 C.F.R. §§ 404.1527(d)(2),

416.927(d)(2), the treating physician rule, to mean the ALJ must give controlling weight to the

treating physician's opinion unless the opinion is not supported by the record.  *Byam v. Barnhart*,

336 F.3d 172, 183 (2d Cir 2003) and *Rodriguez v. Barnhart*, 2004 U.S. Dist. LEXIS 25914, 19

(S.D.N.Y 2004).  Where that opinion is contradicted by the record, it is within the ALJ's

discretion to limit its weight.  (*Id.*)  Furthermore, relying on *Snell v. Apfel*, the Commissioner

argues that Dr. Parikh's determination that Donnelly is disabled was reserved for the

Commission and cannot itself be determinative. (Def. Mot. at 21 relying on *Snell v. Apfel*, 177

F.3d 128, 133 (2d Cir. 1999).)  ALJ Reich gave the proper weight to Dr. Parikh's opinion.

## 2. The ALJ Erred in not Including Testimony from a Vocational Expert

At step four of the evaluation process, ALJ Reich found Donnelly incapable of performing her past relevant work. (Tr. at 19.) Citing two Second Circuit cases, Donnelly argues that ALJ was required to include the testimony of a vocational expert to identify the jobs which exist in the economy that she can perform. (Pl. Mot. at 28-29, referring to *Bapp v. Bowen*, 802 F.2d 601, 603 (2d Cir. 1986), and *Rosa v. Callahan*, 168 F.3d 72, 82 (2d Cir. 1999).) Donnelly notes that ALJ Reich did not take testimony from a vocational expert but relied only on the Medical-Vocational Guidelines at step five of the evaluation process. (Pl. Mot. at 29.) She challenges the ALJ's decision to not take any vocational expert testimony to support her belief that there exist jobs in the national economy Donnelly can perform. (*Id.*)

In *Bapp*, the Second Circuit established that a vocational expert's testimony is required whenever the claimant's non-exertional limitations significantly restricted the range of work he or she can perform. *Bapp v. Bowen*, 802 F2d 601, 606 (2d Cir. 1986). In contrast, when the claimant's non-exertional[4] limitations are either nonexistent or not significant, then a vocational expert's testimony is not required. In the latter situation, the ALJ is free to rely solely on the Medical-Vocational Guidelines. *Benson v. Astrue*, 2011 U.S.Dist. LEXIS 116831, *33, *35 (S.D.N.Y. 2011). *See also Ortiz v. Sec'y of Health & Human Serv.*, 890 F.2d 520, 523 (1st Cir. 1989). Since the ALJ found Donnelly to be significantly impaired, and was limited to sedentary work with the additional limitation of not working with heights or machinery, a vocational expert's testimony was required.

---

[4] Non-exertional impairments are non-strength limitations which affects the claimant's mental abilities, vision, hearing, speech, climbing, balancing, stooping, kneeling, crouching, crawling and environmental restrictions. 61 FR 34478.

ALJ Reich found Donnelly had non-exertional restrictions, and that those limitations reduced her "residual functional capacity to simple work." (Tr. at 109.) ALJ Reich concluded, however, Donnelly's non-exertional limitations "do not significantly limit the range of unskilled light work she can perform. Her non-exertional limitations do not, therefore, have more than a slight effect on her occupational base." (Tr. at 20.)

Donnelly's non-exertional impairments include dizziness which impacts her ability to work with machinery and heights. (Tr. at 13.) ALJ Reich found these impairments restricted Donnelly's ability to perform the full range of employment indicated by the medical vocational guidelines. (Tr. at 20.) She could do sedentary work but was further limited only to those that did not require her to work around machinery or heights. In such a case, a vocational expert's testimony is required. *See Roma v. Astrue*, 468 Fed. Appx. 16, 20 (2d Cir. 2012).

On Appeal, Donnelly contended that the lack of vocational expert testimony or its equivalent as grounds for granting her motion. (Pl. Mot. at 28.) She maintained that by the ALJ's own assessment, she "has an RFC of less than sedentary capacity." (*Id.*) To properly evaluate the combined effect of her RFC and her non-exertional limitations, Donnelly argued that the ALJ should have consulted a vocational expert or equivalent at the fifth step of the analysis to determine what jobs exist in the economy which she could perform. (*Id.* at 28-29.) These impairments constitute severe impairments within the meaning of the Act since they resulted in more than minimal limitations on Donnelly's ability to perform basic work-related activities. (Tr. at 11.)

The ALJ properly completed the five-step analysis. At step four, ALJ Reich established Donnelly was impaired and proceeded to step five in determining whether her impairment prevents her from employment. While ALJ Reich found Donnelly was unable to continue her

past work, she concluded that Donnelly was capable of employment so long as it did not require

her to have too many interactions with people and did not require her to work with machinery or

heights. Nonetheless, the ALJ did not provide examples of such work and the Commissioner did

not meet his burden of proof to establish such a job exist in the economy. As the court explained

in *Pareja v. Barnham* explained:

> When a claimant is incapable of the full range of a certain category of work, such
> as sedentary work, he 'must be evaluated on an individualized basis since the
> medical-vocational grid used by the ALJ does not apply to claimants who cannot
> do sedentary work…**the Commissioner's burden can be met only by calling a
> vocational expert to testify as to plaintiff's ability to perform some particular
> job**.

(*Pareja v. Barnham*, 2004 U.S. Dist. LEXIS 5156, 18 (S.D.N.Y. 2004).) (Emphasis

added).

The Court agrees. Since ALJ Reich found Donnelly could not perform the full range of

sedentary work, a vocational expert should have been used. In *Rodriguez*, the Second Circuit

emphasized that the ALJ has an affirmative duty to develop the record. *Rodriguez,* 2004 U.S.

Dist at 20. Failure to develop the record may be grounds for remand. *Washington v. Colvin*,

2015 U.S. Dist. LEXIS 22030, 36 (S.D.N.Y. 2015). The lack of vocational expert testimony was

a failure to develop the record. An action may be remanded where a gap exists in the record.

*Rosa,* 168 F.3d at 83. Thus, the lack of vocational expert testimony is grounds to remand this

case for further development of the record.

### 3. ALJ Reich Properly Evaluated Donnelly's Credibility

Donnelly argues the ALJ improperly evaluated her credibility. (Pl. Mot. at 29.) She

maintains that the ALJ's assessment of her credibility does not comport with the requirement of

20 C.F.R. § 404.1529(c)(4),  (*Id*. at 30.), which she contends directs the ALJ to evaluate her

credibility based on the evidence not the ALJ's own RFC assessment. (*Id.*) Donnelly argues that

SSR 96-7p makes it clear that the ALJ must evaluate the claimant's credibility prior to making an RFC assessment. (*Id.*)

The Commissioner asserts that the statute does not require that the claimant's statement of pain or other symptoms alone as conclusive evidence of disability. (Def. Mot. at 22.)  Instead, the ALJ must consider what objective, medical evidence is in the record in determining whether disability exists. (*Id.* at 23.)  In her discussion of Donnelly's credibility, ALJ Reich noted that, while Donnelly's "medically determinable impairments could reasonably be expected to cause the alleged symptoms…[Donnelly's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the…residual functional capacity assessment." (Tr. at 17.)  Thus, ALJ Reich relied on the medical record in her assessment of Donnelly's credibility.

The ALJ properly evaluated Donnelly's credibility.  She relied on objective, medical records and found that some of Donnelly's statements were contradicted by the medical records. (Tr. at 17.)  She then inferred those comments were not credible. (*Id.*)  It is within the discretion of the ALJ to evaluate the credibility of claimant's testimony and render an independent judgment in light of the medical findings and other evidence regarding the true extent of the symptoms alleged. *See Snell v. Apfel*, 177 F.3d 128, 135 (2d Cir. 1999) and *Mimms v. Heckler*, 750 F.2d 180, 186 (2d Cir. 1984).  Also, the ALJ's determination should be afforded deference because she heard Donnelly's testimony and observed her demeanor. *See also Tejada v. Apfel*, 167 F.3d 770, 776 (2d Cir. 1999).  (Def. Mot. at 23.)

ALJ Reich's determination of Donnelly's credibility is not only supported by the record but also Donnelly's own statements.  In her testimony, Donnelly complained of difficulties with attention and concentration, but was able to read, to watch television, and to do puzzles with and

to read to her autistic son. (Tr. at 34, 90.) The medical record shows that Donnelly was attentive

with "good" to "fair" concentration. In addition, Donnelly was able to participate in a wide

range of daily activities including taking care of her autistic son. (Def. Mot. at 24.) Her

symptoms did not impair her to the point where she could not take care of her household and her

son.

### 4. The Case Should Be Remanded for Further Administrative Proceedings

Donnelly requests a judgment on the pleadings, or alternatively, for the Court to remand

the case for reconsideration of the evidence. (Pl. Mot. at 7.) A court should order remand to

determine payment of benefits only where the record contains "persuasive proof of disability"

and remand for further evidentiary proceedings would serve no further purpose. *Schall v. Apfel*,

134 F.3d 496, 504 (2d Cir. 1998) (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)).

Remand for further administrative proceedings is appropriate "[w]here there are gaps in the

administrative record or the ALJ has applied an improper legal standard." *Rosa v. Callahan*, 168

F.3d 72, 82-83 (2d Cir. 1999). As discussed above, the ALJ did not consult a vocational expert

in her discussion of jobs in the economy Donnelly can perform. This warrants further

administrative proceeding.

### IV. CONCLUSION

For the reasons outlined above, I recommend that Donnelly's motion be **GRANTED IN**

**PART,** and that the case be **REMANDED** for further administrative proceedings.

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the Parties have fourteen

(14) days after being served with a copy of the recommended disposition to file written

objections to this Report and Recommendation. Such objections shall be filed with the Clerk of

the Court and served to all adversaries, and a copy shall be delivered to the chambers of the

Honorable Alison J. Nathan, 40 Foley Square, 2102, and the undersigned, 500 Pearl Street, 1970.

Failure to file timely objections shall constitute a waiver of those objections in both the District

Court and on later appeal to the United States Court of Appeals. *See Thomas c. Arn*, 474 U.S.

140, 149-150 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989)

(*per curiam*); 28 U.S.C. 636(b)(1)(c) (West Supp. 1995); Fed. R. Civ. P. 72(a), 6(a), 6(d.)

**DATED: March 13, 2015**
**New York, NY**

Respectfully Submitted,

The Honorable Ronald L. Ellis
United States Magistrate Judge